## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STACY ZEID, on behalf of herself, and all others similarly situated,<br><br>                Plaintiff,<br><br>v.<br><br><br>FANDANGO MEDIA, LLC,<br><br>                Defendant. | Case No:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Stacy Zeid ("Plaintiff"), on behalf of herself and all others similarly situated, files this Class Action Complaint against Defendant Fandango Media, LLC, ("Fandango" or "Defendant"), and in support thereof states the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel:

## NATURE OF THE ACTION

1.      This is a class action against Defendant arising out of its practice of falsely advertising lower prices for movie tickets, only to disclose later during the transaction that a consumer must pay a higher price because Fandango charges a mandatory convenience fee.  This bait and switch pricing practice, also known as drip pricing[1], is utilized by Defendant to sell tickets

---

[1] As noted by the FTC, "[d]rip pricing is a pricing technique in which firms advertise only part of a product's price and reveal other charges later as the customer goes through the buying process. The additional charges can be mandatory charges [] or fees for optional upgrades and add-ons." *The Economics of Drip Pricing*, FED. TRADE COMM'N (May 21, 2012), https://www.ftc.gov/news-events/events/2012/05/economics-drip-pricing.

at prices higher than advertised and promised to consumers, and to improperly extract additional money from its customers for its own profit by unilaterally imposing mandatory fees.

2.      Numerous consumer-based studies and the Federal Trade Commission ("FTC") have found that junk fees, like those imposed by Fandango, damage consumers because they mislead consumers into initially believing they will pay a lower cost for the tickets, thereby allowing Fandango to gain advantage from consumer "lock-in" for the purchase, which causes consumers to be reluctant to cancel when the higher price is revealed later in the ticket purchasing process to avoid wasting the time and effort the consumer already invested and incurring more time and effort looking for an alternative.[2]

3.      Fandango's website does not include or disclose the mandatory convenience fee that Fandango charges all consumers in the advertised price that is first displayed to consumers.

4.      Fandango only discloses that the true total cost of a movie ticket includes a mandatory convenience fee at the last stage of the transaction, after consumers spend time and effort going through multiple webpages and selecting theater seats.

5.      Fandango's policy to not disclose its convenience fee upfront prevents consumers from accurately comparison shopping without investing significantly more amounts of time and effort to determine the true total cost of tickets.

6.      Fandango's policy and practices unfairly force consumers to invest significant time into purchasing tickets and then pay higher prices than they would normally pay to avoid

---

[2]      In its November 9, 2023 proposed rule to combat "junk fees," the FTC stated that "[t]his proposed rule addresses prevalent fee practices that are unlawful under Section 5 of the FTC Act, 15 U.S.C. 45, because they are unfair or deceptive to consumers."  *See* 88 FR 77420, at 77431; *see also id* at 77437 (stating "unfair and deceptive practices relating to fees are already unlawful under Section 5 of the FTC Act").  This proposed rule followed the FTC's November 8, 2022 Advance Notice of Proposed Rulemaking on unfair and deceptive fees (87 FR 67413), which also described the widespread use of unfair and deceptive "junk fees."

wasting the time and effort they already invested in the transaction and incurring more time and effort looking for an alternative. As detailed herein, Fandango's mandatory fees are "unlawful junk fees," as described by the FTC, because they are not transparently disclosed and are excluded from an all-in ticket price disclosure that Fandango should and could have reported, but chose not to do.

7.      Plaintiff asserts claims on her own behalf, and all other consumers similarly situated, who paid convenience fees to purchase movie tickets to theaters located throughout the United States, except for theaters in New York, pursuant to the New York Arts and Cultural Affairs Law §25.07(4) ("NYACAL"), and the Illinois Consumer Fraud Act ("ICFA"), to recover actual damages or statutory damages (whichever is greater) against Defendant for failing to include all mandatory fees in the advertised price first shown to consumers for movie tickets.  As the practices described within are continuing and ongoing, injunctive relief is both appropriate and necessary to protect the members of the class and future consumers within the general public from being harmed by the practices complained of in the future and incurring additional injuries. Plaintiff and members of the class are likely to attempt to engage in ticket transactions in the future and Defendant's improper price disclosures as described herein should be modified and corrected to avoid continuation of the ongoing practices complained of.

## PARTIES

8.      Plaintiff Stacy Zeid is a resident of Cook County, Illinois who purchased a movie ticket from Fandango Media, LLC's website on March 21, 2025.

9.      Defendant, Fandango Media, LLC, sells movie tickets on its website and through a phone App to theaters throughout the United States.  Fandango is a limited liability company organized in Virginia, with its principal place of business in Universal City, California.

Defendant is registered to do business in New York as a foreign limited liability company.

Fandango is also a subsidiary of NBCUniversal Media LLC, which holds a majority interest in

Fandango. Upon information and belief, Fandango conducts business at 30 Rockefeller Plaza,

New York, NY 10112 through NBCUniversal's headquarters.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to the Class

Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2). The amount in controversy in this class

action exceeds $5,000,000, exclusive of interest and costs, and Plaintiff and some Class members

are citizens of states other than where Defendant is organized or has its primary place of

business.

11.    This Court has personal jurisdiction over the parties and venue is proper in the

Southern District of New York Court, which is located in New York County, pursuant to Section

19 of Fandango's Terms of Use policy, which states:

> Disputes to Be Heard in Court. We and you agree that any complaint, dispute, or
> disagreement, whether based on past, present, or future events, arising out of or
> related in any way to these Terms or other Terms and Policies or regarding (i)
> your use of or interaction with the Services, (ii) any purchases or other
> transactions or relationships related to your use of the Services, or (iii) any data or
> information you provide to us or we gather in connection with such use,
> interaction or transaction will be resolved in federal or state (including small
> claims) court and neither party shall be required to arbitrate any claims against the
> other. Any unfiled claims following the effective date of this agreement shall be
> resolved in federal or state (including small claims) court as the case may be and
> this dispute resolution procedure expressly supersedes any prior provision of any
> agreement.; and

> Jurisdiction and Venue. Any action or proceeding arising from, relating to or in
> connection with the Terms and Policies will be brought exclusively in the federal
> or state courts located in New York County, New York, and you irrevocably
> consent to the personal jurisdiction of such courts and agree that it is a convenient
> forum and that you will not seek to transfer such action or proceeding to any other
> forum or jurisdiction, under the doctrine of forum non conveniens or otherwise.

12.     Section 19 of Fandango's Terms of Use policy also instructs that New York State Law shall apply to the parties' disputes, stating:

> Applicable Law. The Terms and Policies and the relationship between you and us shall be governed by the laws of the U.S. and the State of New York without regard to its conflicts of law provisions. Except as provided in applicable other Terms and Policies, you agree that the Convention on Contracts for the International Sale of Goods does not apply to your use of the Services or the Terms and Policies. You are responsible for complying with local laws, if and to the extent local laws are applicable. You specifically agree to comply with all applicable laws concerning the transmission of technical data exported from the United States or the country in which you reside.

## FACTUAL ALLEGATIONS

### Drip Pricing is Deceptive, Prevents Comparison Shopping and Increases Costs for Consumers

13.     "Markets work when firms compete on an even playing field – displaying prices to consumers in a fair and transparent manner."  Widespread and egregious violations of this truism due to rampant "junk fee" charges on consumers led the White House to commission a study and issue a Report on ways to address and eliminate such fees. *See* Exhibit 1 "The President's Initiative on Junk Fees and Related Pricing Practices (October 26, 2022)."

14.     The White House Report defined junk fees "as fees designed to either confuse or deceive consumers *or to take advantage of lock-in or other forms of situational market power*." *See* Exhibit 1 (emphasis added).

15.     The White House report stated that "Junk fees are fees *that are mandatory but not transparently disclosed to consumers*. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available." *See* Exhibit 2, The White House Report, "The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition" (March 5, 2024) (emphasis added).

16.     The White House Report noted a large body of evidence shows that mandatory fees charged at the back-end of the buying process – sometimes referred to as "drip" prices –

along with other types of junk fees make it harder for consumers to comparison shop. This causes consumers to underestimate the total price of what they're buying, often increasing total payments. *See* Exhibit 1.

17.    The FTC's analysis of the use of "drip pricing" bolsters the White House Report which found these practices are deceptive and unfair, stating in part: Injury to consumers comes in the form of higher prices and search costs. Several studies have shown that consumers spend more money on the same goods when they are not shown the total price up front.[3]

18.    The FTC found in relevant part "When sellers advertise prices that are artificially low because they do not include mandatory fees that are disclosed only later in the purchasing transaction, consumers end up transacting with those sellers under false pretenses."[4]

19.    "In addition, consumers who wish to compare prices incur additional search costs to make direct comparisons of products when the full price is not disclosed up front. For example, in an online transaction, consumers cannot simply view the first price displayed on each website, but instead need to navigate to subsequent pages or even enter all their payment information and reach the checkout page for each website to determine the total price."[5] These

---

[3] 88 FR 77420 at 77433 (11/09/2023), citing, fn. 162, Rasch, supra n. 153, at 6-8, 20-22, 30-31; Santana, supra n. 153, at 197; Blake, supra n. 153, at 16; Huck & Wallace, supra n. 153, at 2; Busse & Risso, supra n. 153, at 474. ("a study by the live-event ticket seller StubHub found that consumers spent more money--they purchased more tickets and upgraded to more expensive seats--when the total price was not displayed at the beginning of the transaction."). *See also*, 90 FR 2132.
[4] 88 FR 77420 at 77432 citing, fn. 154 E.g., Sullivan, supra n. 153, at 22, 24-25 (describing empirical studies on partitioned pricing); Vicki G. Morowitz et al., Divide and Prosper: Consumers' Reactions to Partitioned Prices, 35 J. Mktg. Rsch., 455 (1998) (on average, subjects shown partitioned pricing underestimated the total price relative to subjects who received the total price up front); Bertini, M., & Wathieu, L., Attention Arousal through Price Partitioning, 27 Mktg. Sci. 2, 236, 239-41 (2008) (showing that when prices are partitioned, subjects give outsized attention to attributes associated with mandatory surcharges rather than the primary product). *See also*, 90 FR 2079.
[5] 88 FR 77420 at 77433, citing fn. 170 ( E.g., FTC-2022-0069-2005 (``The number of times I have wanted to go to a concert or book an Airbnb only to get to the last page before entering in my

pricing schemes entice consumers because price is a material if not overriding factor a consumer considers when deciding to purchase a good or service, especially online. Consumers are unable to make an informed decision when searching for tickets without knowing upfront the true total cost for a ticket which includes all mandatory fees.

20.     Junk fees that are not included in the advertised price and/or provide little or no added value have become common in event ticketing, hotel resort fees, airline baggage and change fees, hidden fees charged by cable providers, and in many other industries. *See* Exhibit 1.

21.     The FTC found "[s]everal psychological theories explain why consumers make errors when the total price is not revealed up front: (1) under the anchoring theory, consumers who first learn of a lower price do not properly adjust their calculations when additional fees are added, thereby underestimating the total cost; (2) under the endowment theory, consumers attach value to things they perceive to be theirs and when consumers begin the purchase process their perception shifts so that stopping the transaction feels like a loss; and (3) under the sunk cost fallacy, consumers who have already invested in an endeavor, such as by taking time to make selections on a website or travel to a store, continue that endeavor even if it would benefit them more to begin again elsewhere."[6]

22.     This price obfuscation, in turn, undermines the ability of compliant businesses – *i.e.*, those using transparent, up-front pricing practices -- to compete on price with those businesses that do not, and inhibits the market from driving down prices overall. The FTC identified StubHub, which provides a ticket marketplace for people to buy and sell tickets, as an example of both an abuser and a victim of the junk fee phenomenon.  In 2014, StubHub

---

payment details, only to find out that the expected price is suddenly up to 50% higher due to various fees tacked on at the last second is absolutely ridiculous.").

[6] 88 FR 77420 at 77434, citing fn. 177-179. *See also*, 90 FR 2073.

abandoned its "junk fee" practice and adopted an all-in pricing model that avoided unfairly

deceiving consumers with later added "junk fees" to its ticket purchase process. However, soon

after it started implementing its all-in practice, it suddenly reverted back to its drip pricing model

after it recognized a loss of significant market share because consumers perceived StubHub's

prices to be higher than its competitors who continued to use unfair and deceptive drip pricing

schemes.[7]

23.    Convenience fees for online movie tickets are similar to convenience fees

commonly charged by online live-event ticket providers and are not reasonably avoidable.[8]

24.    The fees are not reasonably avoidable according to the FTC because in an online

transaction, fees such as for payment processing, electronic ticket ''delivery,'' ''convenience,''

or similar add-on ticketing fees being charged to the consumer are mandatory and, therefore,

such fees must be included in the upfront, disclosed total price if a consumer cannot obtain the

covered good or service as part of the same transaction (e.g., online) without incurring the fee.[9]

25.    The FTC recognized the prevalence of bait and switch pricing in many industries

throughout the economy, often citing actions against fees added onto movie tickets, and that the

fees inflicted harm on consumers across the economy. Although the FTC's final rule expressly

applies to live-event ticketing and short-term lodging, because of longstanding concerns within

those industries, the FTC made it clear that substantially similar practices in other industries are

equally deceptive and harmful to consumers.[10]

26.    Moreover, and importantly, the FTC found that "consumer injury is not

---

[7] 88 FR 77420 at 77434. *See also*, 90 FR 2079.
[8] 90 FR 2066 at 2083.
[9] 90 FR 2066 at 2083.
[10] 90 FR 2066 at 2071 and 2084.

outweighed by benefits to consumers or competition.  The practice of advertising prices that are not the full price does not benefit consumers or competition. Consumers do not receive any benefit from the misleading price presentation. Even where the undisclosed fees are used to pay for something of value to consumers, omitting that fee from the initial price does not benefit consumers.  Nor does this practice benefit competition, as it acts as a hinderance to businesses that opt to disclose the true price, as illustrated in real world examples."[11]

***Fandango.com Uses "Drip" Pricing to Advertise Artificially Low Ticket Prices***

27.    Fandango charges a mandatory convenience fee, but the Defendant does not disclose the existence of the fee or the fee amount in the first advertised price for movie tickets on its website.

28.    A screenshot from April 30, 2025 from Fandango Media, LLC's website demonstrates that consumers must first select a movie theater and time but are not shown a price for movie tickets:

//

//

//

//

//

//

---

[11] 88 FR 77420, at 77434.



29.     After picking a theater location and movie time, consumers are re-directed to a second webpage where consumers are prompted to select their seat location:



30.     If consumers select one or more seats, they are directed to a third webpage. This is the first instance that Fandango advertises a price for the movie ticket; however, consumers are unable to purchase a movie ticket at the advertised price:



31.     If consumers click on the "Next" button for the tickets, a fourth webpage, a pop-

up screen, with options on how to pay for the movie tickets appears. The pop-up screen does not disclose that Fandango charges a mandatory convenience fee:



32.     Only after the consumer clicks on "Continue to Checkout" or "Express Checkout" does Fandango disclose, on a fifth webpage, the true total cost for the tickets, which includes Fandango's mandatory convenience fees:

//

//

//

//

//

//





33.    Fandango advertises prices for tickets that they know are lower than the true total cost of the tickets once it adds its mandatory fee in order to make the tickets more appealing to consumers.

34.    Upon information and belief, Fandango's purchasing experience has remained consistent during the limitations period for each count through the present for theaters located in every state except for New York. In March 2025, as part of a class action settlement that resolved claims of only consumers who purchased movie tickets through Fandango to attend theaters in New York, Defendant changed the purchasing experience for just those theaters located in New York state.

35.    Now, beginning in March 2025, for theaters located in New York state, Fandango discloses to consumers that it charges a convenience fee separate from the base price for the movie ticket at the first instance that Fandango advertises a price for the tickets:



36.     Notably, New York consumers purchasing tickets from within New York state for theaters located outside of New York are still subject to Fandango's drip pricing scheme.  For example, a New York consumer purchasing tickets in New York for a movie showing at a neighboring theater located in New Jersey is still subject to Fandango's drip pricing scheme and that consumer will not see the mandatory convenience fee until after they have chosen a movie theater, selected a seat, viewed a lower advertised price for movie tickets, and then proceeded to a separate check out page.

37.     Therefore, upon information and belief, Fandango continues to engage in its drip pricing scheme, including in the State of New York for New York consumers purchasing tickets at a theater located outside of New York, despite acknowledging it changed its practice for theaters located in New York after its conduct was alleged to be an unfair practice and despite the FTC having viewed the practice as prohibited.

38.     Moreover, price is a material if not overriding factor a consumer considers when deciding to purchase a good or service.

39.    Consumers are unable to make an informed decision when searching for movie tickets without knowing the true total cost for a ticket which includes all mandatory fees.

40.    Fandango's practice of not revealing the total cost to purchase a movie ticket at the initial point the price is advertised but waiting to disclose the fees later in the transaction is deceptive "drip" pricing, as described by the FTC.

**Plaintiff Was Damaged By Fandango's Drip Pricing Scheme**

41.    On or about March 21, 2025, Plaintiff purchased two movie tickets to a 7:10 P.M. showing at a theater in Northbrook, Illinois:



42.    Plaintiff expended time and effort on Fandango's website selecting the movie tickets and seats that Fandango initially advertised as costing $15.69 for an adult ticket and $12.60 for a child ticket.

43.    However, later in the transaction at checkout, Fandango disclosed that the total cost of the tickets included $4.38 in convenience fees, and Plaintiff was unable to purchase the

tickets at the initially advertised price of $15.69 or $12.60 for the adult or child ticket respectively:



44.     Plaintiff decided to purchase the tickets after learning about the convenience fee because Plaintiff did not want to waste the time and energy already invested into the transaction just to have to expend more time and energy searching alternative ticket sites.

45.     Fandango's use of "drip" pricing unfairly took advantage of Plaintiff's lock-in mentality and its situational market power to charge Plaintiff and other consumers higher prices than it would be able to charge if Fandango advertised the total cost of tickets at the initial point of contact with consumers.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff for herself and the Class, repeats and realleges the facts and allegations contained in paragraphs 1 through 45 above, as if fully set forth herein.

47.     Plaintiff Stacy Zeid brings this action for herself and as a representative member for a **Nationwide Class for Count I** defined as:

>     All persons and entities that paid convenience fees to purchase movie tickets at theaters in every state except theaters in the State of New York from Fandango Media, LLC during the relevant period.

48.     Plaintiff Zeid brings this action for herself and as a representative member for a **Subclass for Count II** defined as:

>     All persons and entities that paid convenience fees to purchase movie tickets at theaters in the State of Illinois from Fandango Media, LLC during the relevant period.

49.     Numerosity. Members of the Nationwide Class and Subclass are so numerous that the individual joinder of all members is impracticable. While the exact number and identities of the class members are unknown to Plaintiff at this time, the Defendant sells millions of movie tickets each month to theaters throughout the United States and collected convenience fees for every movie ticket it sold during the relevant period.

18

50.    <u>Existence of Common Questions of Law and Fact</u>. Questions of law and fact arise from the Defendant's actions; such questions are common to all class members and predominate over any questions affecting only individual members of the class including:

    a.   whether the Defendant's practice of advertising lower movie ticket prices only to later disclose the total cost includes mandatory convenience fees violates NYACAL §20.07(4);

    b.   whether the Defendant's practice of advertising lower movie ticket prices only to later disclose the total cost includes mandatory convenience fees is deceptive drip pricing;

    c.   whether the Defendant's failure to include the convenience fee when first advertising the price of the ticket is an unfair business practice or false; and

    d.   whether Plaintiff and class members have suffered actual damages and/or are entitled to statutory damages.

51.    <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the Nationwide Class and the Subclass in that Plaintiff and the Nationwide Class and Subclass members were similarly affected by and sustained damages as a result of Defendant's uniform wrongful conduct, based on Defendant's failure to disclose the total cost of their tickets, including mandatory convenience fees, throughout the online ticket purchase process.

52.    Plaintiff's interests are coincident with and not antagonistic to those of other members of the Class, nor is the Plaintiff subject to any unique defenses.

53.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately protect and pursue the interests of the Class members. Plaintiff understands the nature of the claims herein, has no disqualifying interests, and will vigorously represent the interests of the Class. Plaintiff's counsel, Antonio Vozzolo. Vozzolo LLC, Kenneth T. Goldstein and The Law Office Of Kenneth T. Goldstein, PLLC; Michael R. Karnuth, Law Offices of Michael R. Karnuth;, have vast complex litigation, consumer class action and litigation experience.

54.     <u>Appropriateness of a Class Action</u>. Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved. Questions of law and/or fact are common to the class, and predominate over any questions affecting only individual members, such that a class action is superior to other available methods for fair and efficient adjudication.

55.     The right of Class members to make an informed decision when purchasing movie tickets is common to the entire Class.

56.     The Defendant's actions to charge a mandatory convenience fee applies generally to the class.

57.     Further, the Defendant's convenience fees at less than $5.00 per ticket are too small and the claims too numerous to be economically pursued on an individual basis. Because the damages suffered by individual Class members is relatively small, their interests in maintaining separate actions are questionable and the expense and burden of individual litigation makes it impracticable for Class members to seek individual redress for the wrongs done to them.

58.     Class certification is appropriate because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying standards for Fandango's advertising.

59.     Thus, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications.  Moreover, Plaintiff knows of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

60.     Most class members who were wrongly overcharged will be identifiable by the Defendant's online and phone electronic records, such that the Defendant's records will identify

the exact number of consumers and the total amount of fees collected.

<u>**COUNT I**</u>
**Violation of New York Arts and Cultural Affairs Law §25.07(4)**

61.    Plaintiff for herself and the Class, repeats and realleges the facts and allegations

contained in paragraphs 1 through 45 above, as if fully set forth herein.

62.    To combat the deceptive practice of drip pricing, New York amended the Arts and

Cultural Affairs Law in 2022 to require:

> Every operator or operator's agent of a place of entertainment, any
> licensee or other ticket reseller, or platform that facilitates the sale or
> resale of tickets shall *disclose the total cost of the ticket, inclusive of all
> ancillary fees that must be paid in order to purchase the ticket*, and
> disclose in a clear and conspicuous manner the portion of the ticket price
> stated in dollars that represents a service charge, or any other fee or
> surcharge to the purchaser. *Such disclosure of the total cost and fees shall
> be displayed in the ticket listing prior to the ticket being selected for
> purchase.* Disclosures of subtotals, fees, charges, and any other
> component of the total price shall not be false or misleading, and may not
> be presented more prominently or in the same or larger size as the total
> price. *The price of the ticket shall not increase during the purchase
> process*, excluding reasonable fees for the delivery of non-electronic
> tickets based on the delivery method selected by the purchaser, which
> shall be disclosed prior to accepting payment therefor. Nothing in this
> subdivision shall be construed to nullify, expand, restrict, or otherwise
> amend or modify now existing laws or regulations outside of this article,
> and nothing in this subdivision shall be construed as making lawful any
> fraudulent, deceptive, or illegal act or practice that is unlawful pursuant to
> now existing laws or regulations. N.Y. Arts & Cult. Aff. Law §25.07(4)
> (emphasis added).

63.    Fandango's convenience fee is a mandatory ancillary fee that a consumer cannot

avoid when purchasing a ticket from Fandango.

64.    Fandango does not disclose or include its mandatory convenience fee in the total

cost of the ticket until after a consumer selected the theater location, the show, and the seat for

purchase, and after the consumer received the price for the ticket, and only then, after the

consumer reaches the fifth screen of the purchasing process, does Fandango disclose for the first

21

time the charge for its mandatory convenience fee.  Thus, Defendant violated New York Arts & Cultural Affairs Law § 25.07(4) by failing at the first stage to "disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a service charge, or any other fee or surcharge to the purchaser."

65.     Fandango's mandatory convenience fee ultimately increases the price of the ticket during the purchase process.

66.     Plaintiff and the Class suffered actual damages because they paid a convenience fee made unlawful by Fandango's failure to timely disclose the fee at the outset of the purchasing process.

67.     Plaintiff and the Class members seek an order enjoining the unlawful conduct described herein, actual damages or fifty dollars ($50.00) per violation, whichever is greater, and reasonable attorneys' fees, and costs. N.Y. Arts & Cult. Aff. Law §25.33.

## COUNT II
### Violation of the Illinois Consumer Fraud Act 815 ILCS 505/2

68.     Plaintiff for herself and the Subclass, repeats and realleges the facts and allegations contained in paragraphs 1 through 45 above, as if fully set forth herein.

69.     At all relevant times, there was in full force and effect in Illinois the Consumer Fraud Act, 815 ILCS 505/1, *et seq.*, and Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*

70.     While the parties agreed to apply New York state law, should the Court find the choice of law provision is inapplicable to Plaintiff's claims or that she cannot pursue relief under New York state law, she asserts this claim under her state consumer protection statutes.

71.     Under the Illinois Consumer Fraud and Uniform Deceptive Business Practices Acts, any unfair or deceptive act or practice in the conduct of trade or commerce is actionable.

22

(815 ILCS 505/1, et seq.).  The statute expressly prohibits unfair or deceptive acts including concealment of any material fact.

72.    Section 2 of the ICFA, 815 ILCS 505/2 provides in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been mislead, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

73.    The ICFA expressly incorporates violations of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, ("Uniform Act"), and the Uniform Act provides at Section 2, 815 ILCS 510/2, in pertinent part:

Section 2.    A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he: ...

(9)    advertises goods or services with intent not to sell them as advertised;

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and

(12)    engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

74.    In order to prevail in an action under the ICFA, a plaintiff need not prove competition between the parties or actual confusion or misunderstanding.

75.    This Section does not affect unfair trade practices otherwise actionable at common law or under other statutes of Illinois.

76.    Section 10(a) of the ICFA, states, in pertinent part:

(a)    Any person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper.  Proof of public injury, a pattern, or an effect on consumers generally shall not be required...

(c)    Except as provided in subsection (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

77.    Plaintiff is a consumer under the ICFA, and the Defendant is a business under the ICFA.

**A Deceptive Act or Practice.**

78.    Defendant Fandango's practice of advertising movie tickets at prices without the intent to sell them at those prices violates the ICFA as a material deceptive act or practice.

79.    Defendant Fandango's practice of making misleading statements about the existence of price reductions by advertising movie tickets at reduced prices when consumers are unable to purchase tickets at the reduced price violates the ICFA as a material deceptive act or practice.

80.    Defendant Fandango advertising a lower price initially to consumers only to disclose that the price for the tickets is higher at checkout is a deceptive form of drip pricing that violates the ICFA as a material deceptive act or practice.

**An Unfair Business Practice.**

81.    Defendant's scheme to charge consumers a higher price at checkout by excluding its mandatory convenience fee from the initially advertised price is an unfair business practice.

82.    The Defendant's use of drip pricing, violates the well-established public policy, 815 ILCS 510/2(a)(9) and (11), in Illinois.

83.    The Defendant's advertising prices the Defendant's did not intend to charge

consumers violates Illinois public policy by making false, misleading, or inaccurate statements of fact concerning price reductions and advertising a good without the intent to sell it as advertised. 815 ILCS 510/2(a)(9) and (11).

84.     Further, the Defendant's practice is unethical, oppressive and unscrupulous because the Defendant violated the charged the convenience fee for its own profit at the expense of the Plaintiff and Class members.

85.     The Defendant's practice caused substantial injury because the Defendant's conduct caused millions of class members including Plaintiff to pay higher prices for movie tickets than they otherwise would have.

86.     Finally, the Defendant's conduct is unfair because it causes substantial injury to the consumers who have little alternative except to submit to it.

87.     The Defendant's fee is a mandatory fee that consumers cannot avoid paying when purchasing a ticket on the Defendant's website.

88.     The Defendant has collected millions of dollars from consumers across the United States by charging mandatory convenience fees that are only disclosed at the end of the transaction process.

**Intent on the Defendant's Part that the Plaintiff Rely on the Deception.**

89.     Defendant Fandango concealed material information from the Plaintiff and the Class.

90.     Defendant can easily advertise that is charges a mandatory convenience fee when it first discloses the price of tickets to consumers, like it does for consumers looking at theaters in New York, but chooses not to disclose its fee for theaters located in every other state.

91.     Defendant Fandango intended for consumers in those states to rely on the initially

lower prices in order to charge them higher prices than they would be able if they disclosed the total cost of the tickets at the first instance.

**Occurred in Trade and Commerce.**

92.    Defendant Fandango's wrongful conduct, as alleged herein, occurred in trade and commerce and caused actual damages to Plaintiff and members of the Class.

**Actual Damages.**

93.    Plaintiff and the Class were actually damaged by the Defendant Fandango's drip pricing practice.

94.    Defendant Fandango charged Plaintiff a convenience fees totaling $4.38, in addition to the movie tickets for a total of $33.00 with tax. Plaintiff was unable to purchase the tickets at the initially advertised price of $15.69 or $12.60 and $33.00 is more than Fandango would have been able to charge had Fandango advertised the total cost of the tickets at the first instance.

**Proximate Cause.**

95.    Defendant Fandango's drip pricing practice allowed it to overcharge Plaintiff and consumers who but for the Defendant's actions would not have paid as high of prices for tickets. Additionally, Plaintiff's damages are a foreseeable result of the Defendant's drip pricing practice.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, requests an award, relief and entry of a judgment, as follows:

        a.    An order certifying that this action is properly brought and may be maintained as a class action, pursuant to Federal Rule of Civil Procedure 23; that Plaintiff

Stacy Zeid be appointed a representative of the Nationwide Class and

Subclass; and that Antonio Vozzolo, Vozzolo LLC; Kenneth T. Goldstein, The

Law Office of Kenneth T. Goldstein, PLLC; and Michael R. Karnuth, Law

Offices of Michael R. Karnuth be appointed as Co-Lead Class Counsel;

b.   Compensatory damages in an amount determined at trial;

c.   Restitution in an amount determined at trial;

d.   An Order awarding Plaintiff and the Classes their actual damages or statutory

damages whichever is greater;

e.   Injunctive relief as pleaded or as the Court may deem proper;

f.   An Order awarding Plaintiff her costs of suit, including pre- and post-

judgment interest;

g.   An Order awarding reasonable attorneys' fees; and

a.   Such other and further relief as may be deemed necessary or appropriate for

any of the claims asserted.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 5, 2025

**VOZZOLO LLC**

*By:*      */s/ Antonio Vozzolo*
           Antonio Vozzolo

Andrea Clisura
499 Route 304
New City, New York 10956
Telephone: (201) 630-8820
Email: avozzolo@vozzolo.com
          aclisura@vozzolo.com

- and -

345 Route 17 South
Upper Saddle River, NJ 07458
Telephone: (201) 630-8820

Kenneth T. Goldstein
(*Pro Hac Vice* to be filed)
Matthew G. Norgard
(*Pro Hac Vice* to be filed)
**The Law Office of Kenneth T. Goldstein, PLLC**
20 North Wacker Drive, Suite 1006
Chicago, Illinois 60606
Telephone: (312) 606-0500
Email: ken@krislovlaw.com
        mnorgard@krislovlaw.com

Michael R. Karnuth (*Pro Hac Vice* to be filed)
**The Law Offices of Michael R. Karnuth**
203 N. LaSalle St., Suite 2100
Chicago, Illinois 60601
Telephone: (312) 391-0203
Email: mike@karnuthlaw.com

*Attorneys for Plaintiff and the Proposed Classes*

# EXHIBIT 1

Exhibit 1

# The American Presidency Project

## (https://www.presidency.ucsb.edu/)



### JOSEPH R. BIDEN, JR. (/PEOPLE/PRESIDENT/JOSEPH-R-BIDEN-JR)

### White House Press Release - The President's Initiative on Junk Fees and Related Pricing Practices

October 26, 2022

*The Biden-Harris Administration is taking action on junk fees that hurt Americans' pocketbooks and the economy.*

By: Brian Deese, Neale Mahoney, Tim Wu

Last month, at a meeting of the White House Competition Council, President Biden called on (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=7cf07c2412&e=2156f09505) all agencies to reduce or eliminate hidden fees, charges, and add-ons for everything from banking services to cable and internet bills to airline and concert tickets.

These so called "junk fees" are not just an irritant – they can weaken market competition, raise costs for consumers and businesses, and hit the most vulnerable Americans the hardest.

Today, the Consumer Financial Protection Bureau (CFPB) took new actions (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=f07b39431e&e=2156f09505) to effectively eliminate

billions in banking fees – building on other Biden-Harris Administration actions that are already saving consumers billions more.

On the occasion of today's announcement, this blog provides context on what junk fees are, why they are a concern, and what the Biden-Harris Administration is doing to address them.

**Defining "junk" fees**

There is nothing wrong with a firm charging reasonable add-on fees for additional products or services. In the interests of customization, firms should be free to charge more to add mushrooms to your pizza or to upgrade you to a hotel room with an ocean view. However, in recent years we've seen a proliferation of "junk fees" – a category of fees that serve a different purpose. They can be defined as fees designed either to confuse or deceive consumers or to take advantage of lock-in or other forms of situational market power.[1]

Academic research and agency experience suggest the following fees and fee practices fall within this category:

- **Mandatory fees that often hide the full price.** Some sellers publish a low price and then add mandatory fees later, at the "back-end" of the buying process or when a consumer tries to terminate the service. As the research shows (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=e16897b834&e=2156f09505), by hiding the full price, this practice can lead consumers to pay more than they would otherwise, and it also makes it hard for consumers to comparison shop. An example is the "service fees" added to the cost of a ticket to a concert or sporting event.

- **Surprise fees that consumers learn about after purchase.** Surprise fees that consumers do not expect – and which may not be mandatory – similarly make it hard to comparison shop and can burden household finances. Surprise hospital bills (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=b8e5799216&e=2156f09505) from out-of-network doctors at in-network hospitals and airline "family seating fees" (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=ccbcd75e6f&e=2156f09505) are prominent examples.

- **Exploitative or predatory fees.** Excessive fees that target consumers who have limited alternative options – because they are locked into a product or service, or are otherwise economically vulnerable – can likewise impose a financial burden. As the CFPB explains (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=5189dff6a9&e=2156f09505), a sign of exploitative fees is that they "far exceed the marginal cost of the service they purport to cover." Bank overdraft fees, which greatly exceed the bank's cost of credit, and surprise "termination fees (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=38e35eddc7&e=2156f09505)" are leading examples.

- **Fraudulent fees.** Some fees involve outright fraud or misrepresentations on the part of the seller. An example is advertising a "no fee" bank account that in practice carries significant fees (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=dee52add7c&e=2156f09505).

**The economic issues with "junk fees"**

Markets work when firms compete on an even playing field – displaying prices to consumers in a fair and transparent manner. Mandatory hidden fees risk obscuring the full price, making it harder for consumers to comparison shop – to choose their preferred product and the best deal. These fees can also create an uneven playing field for businesses, making firms that price in a fair and transparent manner seem more expensive than their rivals.

Surprise termination and cancellation fees can harm free and fair competition by increasing underline switching costs (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=2e66129e8e&e=2156f09505) – locking consumers into sub-standard products. Larger switching costs also make it harder for new entrants and more innovative firms to win over market share – reducing market dynamism.

Actions that limit or disallow junk fees have the potential to create more efficient markets by requiring firms to compete on the merits by offering a lower (actual) price or a better product or service. In cases where the junk fee is unjustified, banning the practice outright can reduce firms' incentives to engage in "exploitative innovation (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=79b6a8f2d4&e=2156f09505)" – developing new junk fees rather than improving the actual quality of the product.

*Junk Fees Hit Consumers – and Businesses – in the Pocketbook*

Fees account for tens of billions of dollars in revenue (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=83893324fb&e=2156f09505) – a substantial source of revenue in many industries, including transportation, banking, internet, and hospitality. A sampling of some fee categories where junk fees appear to make up significant fee revenue include:

| | |
|---|---|
| Credit card late payment fees: | $12 billion in 2020 (<u>CFPB estimate</u> (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=9d77905f33&e=2156f09505)) |
| Bank overdraft and non-sufficient funds (NSF) fees: | $15.5 billion in 2019 (<u>CFPB estimate</u> (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=53fe29cf82&e=2156f09505)) |
| Hotel resort fees: | $2.93 billion in 2018 (<u>NYU estimate</u> (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=41ec9def54&e=2156f09505)) |
| Airline baggage and change fees: | $5.97 billion in 2021 (<u>DOT</u> (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=ffb501009b&e=2156f09505) <u>statistics</u> (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=a7040368bc&e=2156f09505)) |
| Cable hidden fees: | $28 billion in 2019 (<u>Consumer Reports estimate</u>) (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=c0ee3bfb5b&e=2156f09505) |

Studies also show that these fees can artificially inflate total prices. In highly competitive markets where firms earn razor-thin margins, junk fees may not raise the total amount consumers pay. The reason is that firms will face competitive pressure to offset junk fee revenue with a lower upfront price. However, many markets are *not* highly competitive, and in these settings, junk fees can cause American consumers to pay more.

A large body of evidence shows that mandatory fees charged at the back-end of the buying process – sometimes referred to as "drip" prices – along with other types of junk fees make it harder to comparison shop. This causes consumers to underestimate the total price of what they're buying, often increasing total payments. Among other findings:

- An experimental study by Rasch et al. (2020) (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=e66c31a5b5&e=2156f09505) found that drip pricing raised firm profits and resulted in consumers paying more than they would if firms were required to charge a single all-inclusive price up front. A series of experimental studies by Santana et al. (2020) (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=61d517bf54&e=2156f09505) similarly found that drip prices caused consumers to pick products with higher total costs.

- An empirical study by Ellison and Ellison (2009) (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=25281e904f&e=2156f09505) of online sales of computer parts found that sellers used hidden fees to obfuscate actual prices and avoid price competition.

- A study by Agarwal et al. (2014) (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=70373c5897&e=2156f09505) found that fee regulation can lower total costs if the fee is unclear – as is the case with drip pricing and other hidden fees – and the market is not perfectly competitive.

- An empirical paper by Agarwal et al. (2015) (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=4f168758dd&e=2156f09505) found that regulation of credit card fees saved consumers $11.9 billion per year in borrowing costs, with the largest impact on the lowest credit score borrowers.

Confusing or coercive fee practices risk harming not only consumers, but also small and medium-sized businesses (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=0e9b96af19&e=2156f09505), which can be targeted by the same kind of fee schemes – including surprise fees and unexpected cancellation charges (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=cdbc280472&e=2156f09505). For example, common carrier industries – industries that provide essential services to dependent businesses – like ocean carriers sometimes use hidden and confusing fee practices to muddy the prices paid. Some

shippers that rely on ocean carriers to ship their goods to market report (https://whitehouse.us19.list-manage.com/track/click? u=c97630621baff8c44fe607661&id=7b96ca98e9&e=2156f09505) that unpredictable fees added to a base price more than doubled the total price they paid for ocean shipping, and these costs are often ultimately passed along to consumers.

*Junk Fees Hit Low-Income Households and People of Color the Hardest*

While *the extra costs of* junk fees affect everyone, they disproportionately impact lower income households and people of color. For example:

- A CFPB study (https://whitehouse.us19.list-manage.com/track/click? u=c97630621baff8c44fe607661&id=851e3fc189&e=2156f09505) found that consumers in low-income and majority-Black neighborhoods paid disproportionately more in credit card late fees.

- A survey by the Financial Health Network (https://whitehouse.us19.list-manage.com/track/click? u=c97630621baff8c44fe607661&id=9d2cc30a69&e=2156f09505) found low- to moderate-income households incurred overdraft fees at nearly twice the rate of high-income households and that Black and Hispanic households were charged overdraft fees at substantially higher rates than white households.

- A 2017 report (https://whitehouse.us19.list-manage.com/track/click? u=c97630621baff8c44fe607661&id=162f826881&e=2156f09505) by the National Consumer Law Center found that Hispanic car buyers paid more in costly add-ons – such as service contracts, insurance, and window etching – than non-Hispanic car buyers.

## The Biden-Harris Administration is Taking Action on Junk Fees

In response to President Biden's call to action, all Competition Council federal agencies are looking for ways to reduce or lower junk fees. While in some cases more work is needed to identify and understand unjustified practices, federal agencies are acting now in places where there is a compelling case to reduce or eliminate fees – and taking comment and engaging stakeholders where greater transparency and data will help to

improve regulatory approaches going forward. To date, the Administration has already taken a number of actions that will save consumers and businesses billions of dollars:

- **Eliminating unfair banking fees**. Today, the CFPB issued guidance (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=6f449394c5&e=2156f09505) explaining that two junk fee practices are unfair and unlawful – effectively banning both. First, the CFPB is making clear that surprise overdraft fees are unlawful. These are fees charged for overdrawing a checking account even though at the time the account owner made a purchase, the bank's website or ATM terminal showed the customer that they had sufficient available funds for the purchase. Second, the CFPB is making clear that surprise depositor fees are unlawful. These are fees charged to customers who deposit someone else's bounced check, penalizing the victim. Together, these actions will save consumers more than $1 billion annually.

- **Additional CFPB actions on bank and credit card fees**. The CFPB is developing rules and guidance on other fees charged by banks and credit card companies. These fees cost consumers more than $24 billion a year combined, with the biggest impacts on low-income Americans. This builds on work CFPB began last year that successfully encouraged 15 of the nation's twenty largest banks to drop the use of NSF charges (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=55e3bc75db&e=2156f09505), and Citi (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=8c1a9884ef&e=2156f09505) and Capital One (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=0dfd14c16c&e=2156f09505) ended the use overdraft fees altogether. As a result, the overall level of overdraft fees is already on track to be down 20% in 2022 from 2019 levels (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=a061019c46&e=2156f09505) – $3 billion less compared to pre-pandemic.

- **Taking aim at bad junk fee practices that span industries**. Last week (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=cdc794bc91&e=2156f09505), the Federal Trade Commission (FTC) voted (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=16eddbcc79&e=2156f09505) to launch a rulemaking process that would broadly reduce junk fee practices across the economy, including for event ticketing, hotels, funeral homes, and any other industry that uses mandatory fees. The rulemaking would address practices such as charging consumers fees they never consented to or charging mandatory fees with little or no added value, like hotel resort fees or event ticket processing fees. This action is an important step towards a future rule that would give the FTC additional information and enforcement tools to take action and seek penalties against companies adopting unfair and deceptive junk fees. This action builds upon the FTC's work bringing multiple enforcement actions challenging junk fees across a variety of industries and returning money to injured consumers. In the auto industry, the FTC charged dealerships like Passport Auto (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=b39d03b363&e=2156f09505) and Napleton (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=fdfaf970ba&e=2156f09505) for tacking on junk fees for unwanted add-ons and other items. FTC took action against Benefytt Technologies (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=4032eb4ef0&e=2156f09505) to halt its practice of charging people separate fees for add-on health products that people didn't know about or want. In First American Payment Systems (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=e49ac3008b&e=2156f09505), the FTC charged that the payment processing company trapped small businesses with surprise early termination fees.

- **Restricting Junk Fees Charged by Auto Dealers**. This June, the Federal Trade Commission (FTC) issued a proposed rule that (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=de441ff94c&e=2156f09505) would restrict junk fee practices by car dealers that are costly and frustrating for consumers. The rule, if finalized, would (1) ban bait-and-switch claims by prohibiting dealers from making deceptive advertising claims to lure in prospective car buyers; (2) prohibit fraudulent add-on products (such as "nitrogen filled" tires that contain no more nitrogen than normal air); (3) prevent dealers from charging consumers surprise fees for an add-on without their clear, written consent; and (4) mandate upfront disclosure of costs and conditions by requiring dealers to make disclosures to consumers like proving a "true offering price" for a vehicle.

- **Requiring Airlines and Airline Search Sites to Disclose Fees Up Front**. In September, the Department of Transportation (DOT) proposed a rule (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=c81f6d0851&e=2156f09505) that would protect travelers by ensuring they know the full price of airline tickets before they buy. The rule, if finalized as proposed, will require airlines and online search sites to disclose up front – while you are comparison shopping – any fees to sit next to your child, for baggage, and for changes or cancellations. The proposal seeks to provide customers the information they need to choose the actual best deal, preventing surprise fees that add up quickly and prevent competition on the basis of price. This builds on previous actions the DOT has recently taken, including issuing proposed rules that would require airlines (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=eb5ada4457&e=2156f09505) to refund fees for checked bags that are significantly delayed and for services not actually provided (like broken WiFi), and to require refunds (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=68ac95d522&e=2156f09505) for delayed and cancelled flights.

- **Requiring Broadband Nutrition Labels**. The Federal Communications Commission (FCC) has issued proposed rules (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=077a4318ed&e=2156f09505) that would, if finalized as proposed, require internet companies to display a standardized "Broadband Nutrition Label" that discloses their monthly prices, fees, and internet speeds – so customers can see which company is cheapest and companies will have to compete for business. The FCC anticipates completing this rulemaking by the end of this year.

- **Reducing the Cost of Shipping Goods**. Congress responded to President Biden's call to crack down on excessive fees in ocean shipping by passing the bipartisan Ocean Shipping Reform Act. The Federal Maritime Commission, which is responsible for implementing the law, recently released a proposed rule (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=795efab592&e=2156f09505) that proposes to bring more clarity, structure, and punctuality to ocean shipping fee billing practices.

---

[1] In its recent Advance Notice of Proposed Rulemaking (https://whitehouse.us19.list-manage.com/track/click?u=c97630621baff8c44fe607661&id=92e744e1ff&e=2156f09505), the Federal Trade Commission defines "junk fees" as "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer, including goods or services that consumers would reasonably assume to be included within the overall advertised price; the term also encompasses 'hidden fees,' which are fees for goods or services that are deceptive or unfair, including because they are disclosed only at a later stage in the consumer's purchasing process or not at all, whether or not the fees are described as corresponding to goods or services that have independent value to the consumer."

---

Joseph R. Biden, Jr., White House Press Release - The President's Initiative on Junk Fees and Related Pricing Practices Online by Gerhard Peters and John T. Woolley, The American Presidency Project

https://www.presidency.ucsb.edu/node/358539

# EXHIBIT 2

Exhibit 2

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.

MARCH 05, 2024

# The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition

Junk fees are fees that are mandatory but not transparently disclosed to consumers.[1] Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available.[2] Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system.

Promoting competition is a core part of the Biden-Harris Administration's economic agenda, and combatting hidden and deceptive fees has been a priority of the Administration from the beginning. As part of this agenda, agencies across the executive branch have proposed and implemented rules to crack down on junk fees in areas they regulate, and recently the Federal Trade Commission (FTC) announced a proposal to ban them many other places.[3] The Administration's action to crack down on junk fees are already yielding billions of dollars in savings for Americans, and going forward the Consumer Financial Protection Bureau's (CFPB) actions alone will likely save Americans roughly $19.5 billion annually, with other rulemakings likely saving billions more.

This issue brief updates CEA's previous work in two ways. First, it looks at the economic theory behind these fees and the related literature. Second, it examines more cases of such fees and documents that their combined scale and scope indicates that the costs to consumers are much larger than previously understood. CEA estimates that ten specific kinds of junk fees amount to $90 billion per year in the United States, or more than $650 per household per year on average. That's high enough to deserve a line item in family budgets, equal to about a fifth of the average household's entertainment spending, per the most recent estimates by the Bureau of

Labor Statistics. These fees are likely not only harming consumers and competition in the short run but give firms an incentive to divert resources away from productive investments and toward non-productive obfuscation, and toward products that carry junk fees and away from products that do not. Thus, they create the potential for inefficient allocation of resources and perverse incentives for investment.

## Economic Theory

In theory, it is not obvious that hiding fees should work: after all, a "perfectly rational" person (the kind economists are sometimes accused of making up) would react the same way to a price increase no matter when or how it is disclosed. It is exactly because humans are not perfectly rational and exhibit behavioral biases that such fees can be very effective at making people spend more money than they initially planned. As a result, businesses have widely adopted them and economic research documents their impacts. For example, in online ticket sales, customers subjected to hidden fees spend up to 21 percent more than those shown the true price upfront, with variation coming from both the quantity and quality of tickets selected in each group (Blake et al. 2018).[4] Thus, these fees distort both the quantity and quality of products purchased away from efficient levels.

In addition to the direct effects, these fees also make it more difficult for consumers to shop for the best price. By preventing consumers from making price comparisons, firms can reduce or eliminate competition on price, in turn allowing them to extract rents from consumers.[5] In economics, this friction is known as a *search cost* (Stigler 1961). Consumers who value their own time and effort may make the choice to just go with the option they have already selected rather than putting more work into identifying which goods are offered at truly lower prices (Ellison and Wolitzky 2012). Of course, this is not an accident: firms strategically impose such fees in order to deter comparison shopping, and any unnecessary time and energy consumers spend searching is a deadweight loss to society.[6]

By impeding competition on price, firms are able to increase their market power. A particularly acute example of this is auto dealerships who rarely, if ever, commit to a final price until consumers are hours into negotiation. A new proposed rule by the FTC – The Combating Auto Retail Scams Rule – seeks to change that by requiring prices to be disclosed up front. Analysis by

agency economists concludes that this will save consumers over *70 million hours* each year, a benefit they calculate is equivalent to $1.75 billion per year in consumer savings.[7]

Once one firm in an industry moves to a junk fee business model, competition can perversely push other firms to do so as well. Firms that do not impose such fees are left at a disadvantage as their products appear more expensive in advertisements, even if their true prices are the same or less than their competitors. A major ticketing platform, for example, once prominently advertised that it had no hidden fees, but was forced to alter its business model in the face of competitors who did. This kind of dynamic can also inhibit the entry of new firms, which would otherwise tend to happen in the face of price increases.

Finally, the problems caused by junk fees are not limited to the industries that use them. Money spent on junk fees is not available to be spent elsewhere, nor can it be saved or invested. It is true that in the absence of these fees, businesses would likely raise their advertised prices to some degree, but research suggests that it is unlikely that the junk fee would be fully added to the cost. But because junk fees—by design—limit competition among firms, some portion of the extra money that firms are able to extract from consumers should be competed away and returned to consumers. This is consistent with the evidence: the literature is clear that junk fees allow firms to substantially raise their prices above the level that would otherwise prevail in the market, leading to billions of dollars in consumer harm. CFPB estimates suggest their rules and guidance on credit card late fees, overdraft fees, and non-sufficient funds (NSF) fees will save Americans approximately $19.5 billion annually. Other rulemakings not included in this calculation will likely save Americans billions more.

At $90 billion per year, the level of these fees meaningfully alters what consumers buy, in turn also harming sectors of the economy that do not use them. As a result, more sectors of the economy have started to add junk fees, and others have added optional tips outside of traditional service industries – a practice which is not identical but uses similar ideas. All of this results in inefficient allocations in the short run, and distorted investment in the long run.

# New Research

Assessing the amount of junk fees in the U.S. economy is not straightforward. Measuring the extent of these fees requires searching through online sales platforms and combining the discovered fees with public data on market share and size, and in many cases the requisite data are simply not available. Because of this, in previous work the White House estimated the prevalence of just a few common junk fees in the U.S. economy. This analysis found that in recent years, five readily-measurable fees led to consumers spending $65 billion per year.

CEA has identified new data that allows the inclusion of four additional markets in our analysis: food delivery apps, restaurant service fees, apartment applications, and event tickets. On top of this, the FTC has recently released its own estimate of auto dealer junk fees. While there are likely many other junk fees across the U.S. economy, measurement challenges mean that these are the only ones feasible to estimate for now.

**Table 1. Selected Junk Fee Totals by Industry**

|  | Fees | Year | Source |
|---|---|---|---|
| Credit card late payment fees | $14.5 billion | 2022 | CFPB estimate |
| Bank overdraft and non-sufficient funds fees | $9.1 billion | 2022 | CFPB estimates |
| Hotel resort fees | $3.3 billion | 2022 | American Hotel and Lodging Association, Nerdwallet [8] |
| Airline baggage and change fees | $8.3 billion | 2023[9] | Bureau of Transportation Statistics |
| Cable fees | $28 billion | 2019 | Consumer Reports estimate |
| Food delivery service fees | $5 billion | 2021 | CEA Estimate |
| Restaurant service fees | $10.8 billion | 2023 | CEA Estimate |
| Auto dealer fees | $3.4 billion | Expected | FTC estimate |
| Apartment application fees | $276 million | 2023 | CEA estimate |

| Event ticket fees | $7.14 billion | 2023 | CEA estimate |

Food delivery apps are notorious for obfuscating delivery and service fees. A recent survey showed one company's hidden fee burden is about 15 percent of transaction volume.[10] This company received 288 million orders in 2021 in the U.S. and had an average sale of about $31. Putting these numbers together, in 2021, this company collected about $1.3 billion from consumers in junk fees.[11]  Using the most conservative assumptions, a similar calculation for a competitor—which in the same survey had a hidden fee rate of 7.5 percent—produces $1.5 billion in junk fees.[12] In addition, the leading grocery delivery service had about $25 billion in transaction volume in 2021 in the United States and Canada, with about 8% being junk fees. These figures imply about $1.7 billion in junk fees. Similar data on U.S. order volume is not available for all competitors in the meal delivery industry, but based on the best publicly available information, junk fees in food delivery are an estimated $5 billion annually across the country.[13]

In recent years, sit-down and counter-service restaurants have begun instituting more severe drip pricing. At sit-down restaurants, customers are used to tipping, but increasingly common mandatory service fees can surprise and mislead people. About 15 percent of restaurants now use service fees, which can be up to 20 percent of the pre-tax bill. Assuming that these fees average 10 percent at full-service restaurants and 5 percent elsewhere, junk fees make up about 1 percent of total restaurant revenue. In 2023, restaurants across the U.S. totaled about $965 billion in sales, meaning these junk fees could add up to $10.8 billion.

When Americans apply to rent apartments, they often face unexpected fees from landlords or brokers. These fees are ostensibly to offset the cost of a credit or background check, but in many cases exceed those direct costs. Some states, such as Massachusetts, Minnesota, and New York, limit or ban charges for rental applications, but most states allow them. Combining data from the Census, Zillow, and other sources, CEA estimates that after accounting for the cost of the background checks that they fund, the excess burden of these fees is about $276 million annually.

Event ticketing is rife with hidden fees, as the customer is initially shown a ticket's face value and then presented with a large additional charge at checkout. The largest publicly-traded ticket broker relies on this practice in all states except the three in which it is illegal: New York, Connecticut, and Tennessee. CEA tabulation estimates that this company charges an average hidden fee of 22 percent. Given that they sold approximately 329 million fee-bearing tickets worldwide and received upwards of 80 percent of their web traffic from the United States, in 2023 this company likely charged around $4.8 billion in hidden fees to U.S. customers.[14] Other major ticket brokers are not publicly traded and thus release less information, but market share data and CEA investigation of competitors' hidden fee practices suggests that the industry junk fee total is around $7.14 billion. For Taylor Swift's Eras Tour and Beyonce's Renaissance Tour alone, Americans may have paid over $250 million in junk fees.

All told, CEA's estimate of junk fees in the U.S. economy is approximately $90 billion per year. And, given that there are many classes of fees not covered here, and that only one of these estimates incorporates the time and effort consumers waste trying to navigate them, this is almost certainly an underestimate. By cracking down on these fees, the Biden-Harris Administration is pushing for greater transparency in pricing, which will leave American consumers better off not only by avoiding such fees, but because they will be buying goods and services through more competitive markets.

----

[1] Not all fees are junk fees. Optional fees for additional services do not fit this definition, nor do fees that are incorporated into the advertised price.

[2] In that way, these fees are an evolution of bait-and-switch schemes, see Lazear 1995, Ellison and Ellison 2009, Rosato 2016.

[4] Research points to a variety of different psychological effects for this outcome, including self-justification and inaccurate beliefs (Santana, Dallas, and Morwitz 2020).

[3] The FTC's proposed rule also targets fees which misrepresent their natures or purposes, for example, suggesting that they are due to a

government-imposed tax when in fact no such tax exists. Such misrepresentations can be similarly harmful to competition by falsely implying that consumers will face them at any competing establishment, but are not the focus of this piece.

[5] In this context, "rents" refers to extra profits sellers extract due to non-transparent pricing.

[6] Many fees, even if they are not strictly mandatory, may also have similar economic effects. For example, not all airline customers need to change their tickets, and ticket change fees may have an important role in dissuading consumers from changing their tickets in ways that are expensive for airlines to accommodate. But complex fee schedules also make it more difficult for consumers to comparison shop, and future events are likely less salient to consumers than the current price of a ticket. For these reasons, firms have an incentive to rachet up these fees.

[7] See page 314 of the FTC's proposed rule for the calculations underlying this figure.

[8] CEA calculates $3.4 billion by combining AHLA's figures of 6% of hotels using resort fees and 1.3 billion room-nights booked in 2022 with NerdWallet's tabulation of $42 in average resort fees.

[10] This survey found that "hidden fees" this company charged were about 35 percent of order volume on average, including optional tips. If we assume (conservatively) that people leave 20 percent tips, the junk fee percentage becomes 15 percent.

[9] For the 12-month period from 2022:Q4 through 2023:Q3

[11] Delivery and service fees may be essential to delivery apps' operations; we term them "junk fees" because they are obfuscated until after the customer is far into the ordering process.

[12] Assuming 50 percent of this company's $42 billion in gross order volume was from customers in the U.S. without premium membership who were exposed to junk fees.

[13] The two meal delivery companies mentioned here had a cumulative market share of about 80 percent in the meal delivery market in 2021. Extrapolating their junk fee rates to the rest of the meal delivery market yields about $500 million of additional junk fees, leading to $5 billion total across meal and grocery delivery.

[14] An average ticket price is necessary to calculate this figure. This company has not publicly released such a figure, CEA took the midpoint between the cutoff for "low-price" tickets on their website ($40) and the average ticket price for the top 100 U.S. concert tours in 2023 ($136).